AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

**RECEIVED**
AUG 16 2019
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.  **19MJ3480**
(760) 660-5823 )
IMSI 312530004822552 )
)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the ____Southern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 952, 960 and 963 | Importation of a Controlled Substance and Conspiracy to Import Controlled Substances |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Whitney Faber, SA, Dept. of Homeland Security
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/16/19

_____
*Judge's signature*

City and state: San Diego, CA     Hon. Allison H. Goddard, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Whitney Faber, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for information associated with the phone number (760) 660-5823, with the International Mobile Subscriber Identity ("IMSI") number 312530004822552 (the "**Target Account**"), including subscriber information, telephone toll data and cell-site geo-location information for the period of February 12, 2019 up to and including May 12, 2019. As set forth below, probable cause exists to believe the **Target Account** contains evidence of violations of federal law, namely, importation of controlled substances and conspiracy to import controlled substances, in violation of 21 U.S.C. §§ 952, 960 and 963.

2. The data associated with the **Target Account** is currently in the possession of the Sprint Corporation, headquartered at the Sprint Corporation, 6480 Sprint Parkway, Overland Park, Kansas 66251 (hereinafter "Sprint"). This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require Sprint to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B. This Court has jurisdiction to issue this warrant because it is "a district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. §§ 2703(c)(1)(A), 2711(3)(A).

## TRAINING AND EXPERIENCE

3. I am a "law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I also am a Federal Law Enforcement Officer within the meaning of Rule 41(b) of the Federal Rules of Criminal Procedure, that is, a government agent engaged in the enforcement of the criminal laws of the United States, and thereby authorized to

request issuance of federal search and seizure warrants. I am empowered to conduct investigations of, and to make arrests for, federal offenses. I have been cross-designated by the Drug Enforcement Administration (DEA) to conduct investigations and make arrests based on violations of Title 21 of the United States Code.

4. I am a Special Agent employed by the U.S. Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) since September 2018. Currently, I am assigned to a contraband smuggling group located in San Diego, CA, that focuses on the organized trafficking of narcotics through and along the Southwest Border. In this capacity, I investigate and assist in narcotics cases involving, but not limited to, the purchase, possession, sales, production and distribution of illegal narcotics and the laundering of its proceeds. Prior to position as an HSI Special Agent, I was employed as United States Border Patrol (USBP) Agent from March 2003 until September 2018. As a USBP Agent, I conducted many criminal investigations involving violations of federal and state laws including, but not limited to alien smuggling, narcotics smuggling, kidnapping, extortion and organized criminal activity.

5. I am a graduate of the Federal Law Enforcement Training Center ("FLETC") Criminal Investigator Training Program ("CITP") and the HSI Special Agent Training ("HSISAT") course. During these courses, I was trained in various types of criminal investigations, to include investigations involving the illegal trafficking of narcotics, currency, firearms and contraband. I have bachelor's degree in Business Administration and Financial Services from San Diego State University.

6. My training and experience in narcotics enforcement has included narcotics interdiction, the identification of different types of narcotics, and the investigation of persons in possession of narcotics for purposes of sales and transportation. In addition, I speak regularly with narcotics investigators at the federal, state and local level regarding the manner in which sellers of narcotics store, transport and sell narcotics.

7. I have participated in many aspects of criminal investigations including the monitoring of electronic interceptions pursuant to Title III court orders, issuance of

2

subpoenas, reviewing evidence, conducting physical and electronic surveillance, working with informants, and the execution of search and arrest warrants.

8. In the course of my duties, I have personally participated in and conducted investigations of violations of various State and Federal criminal laws, including those related to narcotics violations. I have arrested or participated in the arrest of persons for violations of the Controlled Substances Act. In these cases, I have conducted interviews with the arrested persons and their associates. I have conducted surveillance of narcotics smugglers as they conduct their smuggling activity while crossing the border from Mexico into the United States. Through these investigative activities, I have gained a working knowledge and insight into the typical activity of narcotics smugglers, and the structure of their narcotics smuggling networks

9. Based on my training and experience, I am familiar with how drug traffickers communicate and operate. For example, I am aware that drug traffickers frequently communicate through the use of cellular telephones, social medial platforms, and other technology to advance their narcotics trafficking activities and often use coded language to obscure conversations about their unlawful activity, because they believe coded language makes it more difficult to identify their conduct. I also know that drug traffickers change accounts, platforms, and devices as a means to evade detection by law enforcement. Moreover, I know that drug traffickers obtain phone numbers, accounts, platforms, and devices from third parties and or subscribe to them in fictitious names to mask the true identity of the individuals using the accounts, platforms, or devices.

10. The following is based on my own investigation, oral and written reports by other law enforcement officers, interviews, subpoenaed and public records, database checks, and other investigations. Since this affidavit is for a limited purpose, I have not included every fact that I and/or others know about this investigation. I set forth only facts necessary to establish probable cause for the requested search warrant. Conversations and discussions below are set forth in substance unless noted.

## FACTS IN SUPPORT OF PROBABLE CAUSE

11. According to a report written by CBP Canine Enforcement Officer L. Manis, while performing pre-primary roving inspection duties at the Otay Mesa, California port of entry ("POE") on May 12, 2019 at approximately 8:15pm, she encountered GOMEZ driving a 1998 Lexus ES 300 sedan bearing California license plate 4ARF829 (the "Lexus"). Officer Manis screened the Lexus with her Narcotics & Human Detection Dog (NHDD), "Lotta" (#160197), and received an alert from Lotta to the trunk area of the Lexus. Officer Manis opened the trunk of the Lexus for further inspection. Officer Manis then received a second alert from Lotta to the rear wall of the trunk behind the rear seat.

12. According to a report written by CBP Officer C. Rodriguez, Officer Rodriguez arrived to assist Officer Manis. Officer Rodriguez noted GOMEZ was talking on her cell phone. Officer Rodriguez asked GOMEZ to turn off her cell phone. Officer Rodriguez obtained two negative customs declarations from GOMEZ for any goods and/or merchandise entering the United States. During the inspection, GOMEZ stated she was the owner of the Lexus but she had not registered it yet. GOMEZ told Officer Rodriguez she was entering the United States in route to Palm Springs, CA.

13. According to a report written by CBP Officer G. Gomez, Officer Gomez inspected the Lexus at approximately 8:29 p.m. utilizing the Z-Portal Non-Intrusive Inspection system. Officer Gomez noticed anomalies in rear seat area of the Lexus.

14. According to a report written by CBP Officer J. Harris, Officer Harris searched the Lexus in the vehicle secondary lot. Officer Harris observed packages concealed between the rear seat and trunk of the Lexus. Officer Harris removed a total of 19 packages. The contents of the packages field-tested positive for the properties of methamphetamine. Officer Harris then notified Homeland Security Investigations of the seizure. Officer Harris placed GOMEZ under arrest. The total weight of the nineteen packages was approximately 10.86 kilograms (23.94 pounds).

15. I was notified of the event, responded to the Otay Mesa POE, and subsequently placed GOMEZ under arrest. I further seized the Vehicle, the methamphetamine packages, and the **Target Device.**

16. GOMEZ was advised of her Miranda rights in the English language. GOMEZ waived her rights, and I subsequently conducted a recorded interview of GOMEZ.

17. GOMEZ denied knowing the methamphetamine was concealed within the Lexus. GOMEZ stated that she went to Rosarito, Mexico approximately two weeks ago to visit her mother, Sandra Cornejo. GOMEZ stated that her mother gave her the Lexus as a surprise gift, and that the Lexus had been in her possession since she received it from her mother. GOMEZ stated that her mother, Sandra Cornejo, purchased the vehicle from the dealer listed on the registration. GOMEZ stated that the same day she received the Lexus from her mother, she crossed the border and drove to Desert Hot Springs, CA. GOMEZ stated that she has been using the Lexus to commute for work, and further stated that she had not taken the Lexus to a mechanic or had any maintenance performed. GOMEZ stated that no one else has driven the Lexus since she received it from her mother. GOMEZ stated that she returned to Rosarito approximately three days prior to visit her mother and daughter. GOMEZ stated she was in route to Palm Springs, CA.

18. GOMEZ was given the opportunity to use the **Target Device** during the interview, and she entered her password and called a contact identified as "Mandigo Blade" at (760) 461-0556. GOMEZ informed Mandigo Blade that she had been detained at the border. Mandigo Blade informed GOMEZ that he was in Las Vegas and could not help her and the conversation ended.

19. On August 1, 2019, United States Magistrate Judge Linda Lopez, signed search warrant 19-MJ-3233 for the **Target Device.**

20. On August 5, 2019, Special Agent A. Castellanos, a certified Computer Forensics Agent, conducted a logical extraction of the **Target Device**. Among other items extracted, the phone contained pictures, a call log, and text-based communications that tended to demonstrate the phone was used up until the day of arrest. The IMSI and the

telephone number were recovered via a logical extraction from the Sprint SIM card that was inserted in the **Target Device**. The associated phone number is (760) 660-5823 and the International Mobile Subscriber Identity ("IMSI") number is 312530004822552. Subsequent investigative efforts identified the carrier of the **Target Account** to be Sprint.

21. Based upon my experience investigating drug smuggling, my training, and my consultation with other investigators who have experience investigating drug smuggling near the border, I understand drug smugglers will seek to smuggle drugs from Mexico to the United States by hiding the drugs in hidden compartments of vehicles, and in non-factory compartments (*i.e.*, compartments that the manufacturer did not design for ordinary use). Smugglers will then drive north from Mexico and seek to pass through POEs with the drugs undetected. I am also aware that such individuals will sometimes try to generate a history of crossings to show that driving through a POE is ordinary behavior for them. When they arrive in the United States, smugglers will take the drugs to a discreet location to transfer them to other people involved in the distribution chain, who can then send the drugs to other locations for downstream distribution.

22. Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I further submit the following:

   a. Drug smugglers use cellular telephones because the devices are mobile and provide instant access to telephone calls, texts, internet, application-based communications platforms (*e.g.*, WhatsApp), and voice messages;

   b. Drug smugglers use cellular telephones because they are able to actively monitor the progress of the illegal cargo while the conveyance is in transit;

   c. Drug smugglers and their accomplices use cellular telephones because the phones help them arrange for the delivery of cargo at predetermined locations and monitor / plan for arrival times;

   d. Drug smugglers use cellular telephones to direct couriers to synchronize drop off and pick up times of the illegal cargo;

   e. Drug smugglers use cellular telephones to notify or warn accomplices about law-enforcement activity, such as the presence and posture of marked and perceived unmarked patrol vehicles, or the operational status of border checkpoints and border crossings;

   f. The use of cellular telephones by smugglers tends to generate evidence stored on the cellular telephones, including but not limited to emails, text messages, application-based communications, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data; and

   g. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

23. In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including Cell Site Location Information (CSLI), also known as "tower/face information" or "cell tower/sector records." CSLI data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, CSLI data provides an approximate location of the cellular telephone but is

typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

24. I also know from my training and experience that Mobile Network Operators (MNO's) commonly collect and store historical precision location information that may provide historical geographic location of a user's mobile device. This data may provide an estimate of the user's mobile device locations. This technology is MNO specific and may be referred to as Round Trip Tool/Time (RTT), Per Call Measurement Data (PCMD), Network Event Location System (NELOS), TDOA or Timing Advance Information (TrueCall), and Activity Log.

25. Based on my training and experience, I know that Sprint can collect CSLI data about phones, including information constituting the Account. I also know that wireless providers such as Sprint typically collect and retain CSLI data pertaining to cellular phones to which they provide service in their normal course of business, including roaming phones from other carriers that connect to Sprint's network, in order to use this information for various business-related purposes.

26. Based on my training and experience, I know wireless providers such as Sprint typically collect and retain information about their subscribers and network users in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the methods of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Sprint typically collect and retain information about a phone's use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the user or users of the phone associated with the Account and may assist in the identification of co-conspirators.

8

27. Based upon my training and experience as a Special Agent, and consultations with law enforcement experienced in drug smuggling investigations, and given the facts surrounding GOMEZ's arrest, GOMEZ's statements regarding her travel and movements with the smuggling vehicle, my review of GOMEZ's border-crossing activity, my review of vehicle's border-crossing activity, I submit there is probable cause to believe GOMEZ used the **Target Account** leading up to, and during the smuggling event, and information relevant to the smuggling activities of GOMEZ will be found in a review of the **Target Account**. Based on the foregoing and in light of my training and experience, I further submit there is probable cause to authorize a review of the **Target Account** for three months prior to GOMEZ's arrest, *i.e.*, from February 12, 2019 up to and including May 12, 2019

## CONCLUSION

28. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

29. Based upon my training and experience, consultation with other law enforcement officers experienced in narcotics investigations, and all the facts and opinions set forth in this Affidavit, there is probable cause to believe that the Account to be seized, as set forth above and in Section I of Attachment B, will be found in the location described in Attachment A, and will contain evidence of violations of 21 U.S.C. §§ 952, 960, and 963. Therefore, I respectfully request that the Court issue a warrant authorizing me, or another federal law enforcement agent, to order Sprint to search its corporate records for the Account and to order Sprint to deliver the **Target Account** listed in Section I of Attachment B.

Whitney Faber, Special Agent
Homeland Security Investigations

Subscribed and sworn to before me
this ⎽16th⎽ day of August, 2019.

Hon. Allison H. Goddard
United States Magistrate Judge

9

# ATTACHMENT A

## *Item to be Searched*

This warrant applies to records and information associated with phone number (760) 660-5823, with the International Mobile Subscriber Identity ("IMSI") number 312530004822552 (the "Account"), that are stored at premises controlled by the Sprint Corporation ("the Provider"), 6480 Sprint Parkway, Overland Park, Kansas 66251.

## ATTACHMENT B

### *Items to be Seized*

The officer executing the warrant shall permit the Sprint Corporation, as custodian of the computer files described in Section I below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**I.   Items to be provided by the Provider**

The following information about the customers or subscribers of the Account:

   i. Names (including subscriber names, user names, and screen names);
   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);
   iii. Local and long distance telephone connection records;
   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
   v. Length of service (including start date) and types of service utilized;
   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"); and
   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

2

   i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

   ii. Cell site locations and sectors for all outgoing and incoming voice, SMS, MMS, and Data transactions;

   iii. All available Timing Advance Reports, currently known as True Call, to include cell site, sector, and distance from tower, IP session and Data;

   iv. Sprint Corporation and Sprint Spectrum, L.P., Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network;

   v. List of all cell-sites, as of February 2019, for all state(s) in which the above records used cell locations. Cell site lists to include switch, cell-site number, name, physical address, longitude and latitude, all sectors associated with each cell-site, azimuth, and beam-width of each related sector; and

   vi. All available Mobile Data Session and IPv6 reports.

## II. Information to be Seized by the Government

All information described in Section I that constitutes evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 952, 960 and 963 and involving Jessica Marie GOMEZ during the period of February 12, 2019 up to and including May 12, 2019.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.